**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ROBERT MUSTAFA LA'HORI,

Plaintiff,

v. Case No. 3:23-cv-1307-WWB-LLL

JOHN FRANC MCGUIRE, et al.,

Defendants.
_________________________________/

**ORDER**

THIS CAUSE is before the Court on Defendants' Motion for Summary Judgment ("**Motion**," Doc. 85) and supporting documentation (Doc. Nos. 84, 86); Plaintiff's Response (Doc. 91) thereto and supporting documentation (Doc. Nos. 88, 92, 96); and Defendants' Reply (Doc. 95) and supporting documentation (Doc. 94).[1] For the following reasons, Defendants' Motion will be granted.

## I. BACKGROUND

Plaintiff Robert Mustafa La'Hori, currently an inmate of the Florida Department of Corrections, is proceeding pro se and in forma pauperis on an Amended Complaint alleging constitutional violations related to his arrest on March 25, 2023. (Doc. 28). Plaintiff sues the following Defendants in their individual capacities: (1) Deputy John Franc McGuire ("**McGuire**"); (2) Deputy Brian Armenta ("**Armenta**"); (3) Deputy Gavin Dane Higgins ("**Higgins**"); (4) Sergeant Thomas Bickhart ("**Bickhart**"); and (5) Deputy

[1] The Court previously advised Plaintiff of the provisions of Federal Rule of Civil Procedure 56, and notified him that the granting of a motion for summary judgment could prevent any future litigation of the claims. (*See* Doc. 5).

George Montgomery ("**Montgomery**"). (*Id.*). The Court previously dismissed all claims against Sergeant Domenic Giordano and Sheriff Robert A. Hardwick, as well as the official-capacity claims against Bickhart. (*See* Doc. 49). The following claims remain: (1) claims for excessive use of force against McGuire, Armenta, and Higgins; and (2) claims for failure to intervene against Armenta, Higgins, Bickhart, and Montgomery. (*See id.*).

Presently, McGuire, Armenta, Higgins, Bickhart, and Montgomery move for summary judgment in their favor as to all remaining claims. (Doc. 85). Defendants invoke the defense of qualified immunity, and argue "the undisputed evidence in the record shows there is no genuine disputed issue as to any material fact." (*Id.* at 2). Plaintiff disagrees and asks the Court to deny Defendants' Motion. (Doc. 91 at 2).

## II. LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.* "The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007). Stated differently, the moving party discharges its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

However, once the moving party has discharged its burden, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by [his or] her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quotation omitted). The nonmoving party may not rely solely on "conclusory allegations without specific supporting facts." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). Nevertheless, "[i]f there is a conflict between the parties' allegations or evidence, the [nonmoving] party's evidence is presumed to be true[,] and all reasonable inferences must be drawn in the [nonmoving] party's favor." *Allen*, 495 F.3d at 1314.

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). In cases involving video evidence, the "Court will accept the video's depiction over [a party's] account of the facts if the video obviously contradicts [that party's] version of the facts." *Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) (citations omitted)[2]; *see also Charles v. Johnson*, 18 F.4th 686, 692 n.1 (11th Cir. 2021) ("Where video evidence is conclusive, witness testimony cannot be used to introduce a factual dispute."); *Singletary v. Vargas*, 804 F.3d 1174, 1183 (11th Cir. 2015) ("[W]hen the non-movant's assertion is 'so utterly discredited' by the record, no 'genuine' dispute of material fact exists sufficient to prompt an inference on behalf of the non-movant."); *Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) (stating that

[2] Any unpublished decisions cited in this Order are deemed persuasive authority on the relevant point of law. *See McNamara v. GEICO*, 30 F.4th 1055, 1061 (11th Cir. 2022).

"where an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible"). "But where the recording does not clearly depict an event or action, and there is evidence going both ways on it, we take the [non-movant's] version of what happened." *Shaw v. City of Selma*, 884 F.3d 1093, 1097 n.1 (11th Cir. 2018).

## III. STATEMENT OF FACTS[3]

On the afternoon of March 25, 2023, deputies with the St. Johns County Sheriff's Office responded to a CVS pharmacy to investigate a reported theft. (Doc. 84-2 at 6, 12, 22). There, the deputies met with a woman who believed her wallet had been stolen while she was at a Publix store at around 3:00 p.m. that day.[4] (*Id.* at 6, 12, 18–19, 23). The victim was notified by her bank that someone had attempted to use her credit cards to purchase gift cards at CVS, but by the time she arrived, the two female suspects had left. (*Id.* at 6, 17–20, 22–23). While the deputies were reviewing security video footage at CVS, trying to identify any vehicle that the suspects may have used, the victim received additional notifications that someone had attempted to use her credit card at a Lane

---

[3] The facts are drawn from the Amended Complaint (Doc. 28), Plaintiff's Affidavit (Doc. 92-1), Plaintiff's medical records (Doc. 92-2), state court records of Plaintiff's criminal case (Doc. Nos. 84-6, 84-7), the transcript of Plaintiff's criminal trial testimony (Doc. Nos. 92-6, 94-1), the transcript of Higgins's deposition testimony (Doc. 92-4), the deputies' incident reports (Doc. 84-2) and response to resistance report (Doc. 84-3), and Armenta's body-worn camera footage (Doc. 84-4). Unless noted otherwise, the facts are undisputed.

[4] At Publix, the victim interacted with a heavyset, white female wearing a purple shirt and a mask. (Doc. 84-2 at 18–20). About ten minutes after this interaction, the victim started receiving notifications about her credit cards, and realized that her wallet was missing. (*Id.*).

Bryant store at St. Augustine Premium Outlets Mall.[5] (Doc. 84-2 at 6, 12, 19, 23; Doc. 92-4 at 6–7).

McGuire and Higgins, who were later joined by Montgomery, headed to the mall to search for the suspects based on the description and photo from the CVS security video footage. (Doc. 84-2 at 6, 12–15, 19–20, 23; Doc. 92-1 at 1; Doc. 92-4 at 7). McGuire noticed that one of the female suspects matched the description of a female who was previously involved in a similar incident in the area. (Doc. 84-2 at 23). Having this information, he advised the deputies canvassing the area to look for a burgundy Chrysler minivan. (Doc. 84-2 at 23; *see also* Doc. 92-4 at 7). While driving through the parking lot, McGuire observed a van matching this description, which was parked in the fire lane in front of the stores. (Doc. 84-2 at 23). McGuire advised dispatch he had located the van and proceeded to park his vehicle. (*Id.* at 6, 13, 23). McGuire observed a short, heavyset female, matching the description of one of the suspects, walking towards the van. (*Id.* at 23). In his report,[6] McGuire recites the following events:

> While walking up to the vehicle, the driver ([a] black male [with] black dread bradded hair, . . . a white and black scarf on his neck, [and a] possible nose ring in [the] left nostril) looked directly at me, and quickly looked down and to his right inside the vehicle. I could see the front passenger was a possible female subject wearing a black burqa. She appeared to be staring down at her phone. I could see the short[,] heavy[]set female getting into the rear passenger side sliding door.
>
> I then heard the driver yell[:] "[S]hut the fucking door, cops are here." At that time, I was walking on an angle toward the driver side B pillar of the

[5] Plaintiff admits that on that day, he and his three female companions were at Publix to pick pockets before heading to CVS and the mall where they used the stolen credit cards. (Doc. 92-1 at 1; Doc. 94-1 at 2–4, 29–31, 38, 48).

[6] McGuire's recitation of the events is consistent with the other deputies' reports, the video footage from Armenta's body-worn camera, and Higgins's deposition testimony. (*See* Doc. Nos. 84-2, 84-3, 84-4, 92-4).

vehicle, because I could see the driver turning the steering wheel to the left. I could also hear what I thought was his power steering motor making a loud noise, indicating he was causing stress on the motor while turning the wheel in a stationary position. I observed the tire itself moving to the left. While the driver was still looking down, he suddenly hit the gas and looked up in the direction I was originally walking. If I was walking in my original path towards the vehicle, I would have been struck. The driver then looked to the left at me realizing I had moved, and we made direct eye contact. He then turned the steering wheel to the left even further, while accelerating even faster. I observed the driver squint his eyes as if he was bracing for impact. It was obvious the driver was trying to intentionally angle his vehicle so the rear of the vehicle collided with me, in the position I was currently in. I quickly moved to my right, just before the vehicle could strike me. If I had not moved to my right[,] the vehicle would have struck me. The vehicle then drove a short distance and stopped. I made direct eye contact once more with the driver in the left side mirror, as he was looking back at me. I could see the rear passenger also turn around and look back at me. The rear passenger van door was still open, because the female was unable to close it while it was accelerating. I could hear the driver yell[:] "[C]lose the fucking door, I missed that nigga." I then observed the driver quickly put his seatbelt on and accelerate after the rear sliding door was closed.[7]

The vehicle continued southbound through the outlet mall, nearly striking a crowd of people walking to their vehicles. I ran towards the vehicle in an attempt to obtain the license plate, or help any victims if they were struck. Multiple witnesses were yelling[:] "[O]fficer[,] are you ok[?] I saw him try to hit you." I stated I was ok, and ran back to my patrol car. During that time, I radioed to units in the area, the vehicle was heading southbound at a high rate of speed through the outlet mall parking lot. I advised any unit in the area to block the exit if possible. I advised dispatch I positively identified the suspect that was in the vehicle, and we have additional charges of aggravated assault, because the driver attempted to run me over.[8]

Higgins advised he observed the vehicle leave the outlet mall, and run a red light onto State Road 16, towards I-95. Higgins followed the vehicle and

[7] Plaintiff claims that the deputies did not indicate in any way they were after him while he was driving from the mall at allegedly normal speed. (*See* Doc. 28 at 13; Doc. 92-1 at 1–2; Doc. 94-1 at 2–5, 23, 30–31, 48).

[8] After McGuire stated over the radio that the van had almost run him over, Montgomery initiated his emergency lights and siren, and began driving to the south exit to locate the van. (Doc. 84-2 at 15).

initiated a vehicle pursuit due to the aggravated assault charge and the driver's disregard for public safety.[9]

I followed the pursuit southbound on I-95 until the State Road 206 exit. I was advised by Montgomery [that] the suspect crashed into the median and was traveling northbound into oncoming traffic. As I was approaching the exit, Montgomery stated the suspect vehicle was getting on the off ramp and heading towards State Road 206, so I continued the pursuit with Armenta.

There were multiple civilians stopped on the side of the road advising the suspect vehicle was traveling northbound on I-95, [which] was confirmed by units still traveling southbound. I was able to see the suspect vehicle in the left lane when I got onto I-95.

Armenta and I quickly caught up to the vehicle, and it was showing heavy damage on the passenger side, and front end from crashing into the median.

---

[9] Higgins reports that as soon as he saw Plaintiff's van heading south, he started his emergency lights and attempted to block him in, but the van swerved to the left, driving recklessly and at a high rate of speed past multiple walking pedestrians. (Doc. 84-2 at 13; Doc. 92-4 at 9). Several other deputies, including Armenta and Montgomery, joined in the pursuit with their lights and sirens on. (Doc. 84-2 at 5–6, 10–13, 15, 24; Doc. 84-4; Doc. 92-4 at 9–11). The deputies attempted to stop the van as it got on I-95, but Plaintiff increased his speed to over 100 miles per hour, making several dangerous lane changes, and driving on both shoulders of the highway to pass traffic. (Doc. 84-2 at 5–6, 12–15, 20–21, 24; Doc. 84-3 at 3; Doc. 92-1 at 2; Doc. 94-1 at 4–5, 23). Plaintiff claims he did not know the deputies were chasing him until he got on I-95, but admits he continued to flee even after realizing they were chasing him because he "got scared." (Doc. 92-1 at 2; Doc. 94-1 at 9–11, 31–34, 36, 49). Armenta turned on his body-worn camera at approximately 4:01 p.m. (Doc. 84-2 at 10; Doc. 84-3 at 3; Doc. 84-4). At approximately 4:04 p.m., Plaintiff "made a sudden left turn across all lanes," attempted to make a U-turn, "struck the median and began driving towards oncoming traffic" on the southbound ramp at State Road 206, after which he re-entered I-95 northbound at around 4:05 p.m. (Doc. 84-2 at 5–6, 10, 12–16, 21, 24–25; Doc. 84-3 at 3; Doc. 92-4 at 11; *see also* Doc. 84-4). Plaintiff admits he kept driving south for about thirteen miles until he reached Road 206, but denies driving erratically or hitting the median guardrail. (Doc. 94-1 at 11–12, 32–33). Plaintiff's assertions are contradicted by the rest of the record, including the video evidence. (*See* Doc. 84-4). At mile marker 316, Higgins, who was driving directly behind Plaintiff's van at the time, observed the female passenger on the front seat throw a bag out of the window. (Doc. 84-2 at 13–14; Doc. 92-4 at 17–18). This incident was also witnessed by civilians, and the discarded items were later identified as stolen credit cards and identification cards. (*See, e.g.*, Doc. 84-2 at 8).

> Armenta was positioned to the driver side of the vehicle, and I was directly to the rear. The driver suddenly swerved off, nearly striking Armenta's patrol car in an obvious attempt to run him off the road. As we continued northbound[,] Armenta tried to get alongside the vehicle, as he stated on the radio[,] [because] he wanted to box it in and slow it down. I stayed behind the vehicle, and it swerved a second time at Armenta, another obvious attempt to run him off the road, this time causing him to swerve and jam on his breaks. This caused Armenta to fall back, behind me momentarily. Armenta was now the second unit in the pursuit and took over radio traffic. He radioed to units the suspect tried to hit his patrol car, and Bickhart stated[:] "[D]o what you gotta do."
>
> I observed there were no vehicles ahead of the suspect vehicle, as well as my patrol car, for several hundred feet. Due to the driver attempting to strike Armenta's vehicle, and the lack of care for public safety, I initiated a PIT (Precision Immobilization Technique) maneuver.
>
> The vehicle was forced off the roadway from the PIT maneuver, and ended up in the grass on the right shoulder. The driver regained control of the vehicle for a few hundred feet, before coming back onto the roadway. While the vehicle was coming back onto the roadway, the driver looked at me and intentionally rammed his vehicle into the front passenger side of my patrol car. This collision caused my patrol car to become immobilized, due to my front passenger tire being damaged.[10]
>
> The suspect vehicle was ultimately spun around from the collision and ended up alongside me facing head on. As I was getting out of my vehicle[,] I was struck by my driver side door. This was the result of Armenta striking the suspect's vehicle. This forced me back into the vehicle, and I landed on the passenger seat/floorboard area. The suspect vehicle then rolled backwards, at which . . . time Armenta struck the front of the suspect's vehicle again. The vehicle was then boxed in from behind, [by] Montgomery['s] [vehicle]. The driver got out and reached back into his vehicle, as if he was trying to retrieve something. He looked at me and observed I was exiting my vehicle again, so he began to run northbound toward the wood line.
>
> Armenta and I chased the driver on foot that time.[11] While approaching the wood line[,] I observed Armenta fire his Taser at the subject. I am

[10] Plaintiff denies ever trying to ram a police vehicle, and states he lost control over the van after the PIT maneuver. (Doc. 94-1 at 15–17, 36).

[11] During the brief foot pursuit, McGuire and Armenta ordered Plaintiff to stop and show his hands, but he continued running. (Doc. 84-2 at 11, 14, 25; Doc. 84-3 at 4; Doc. 84-4; Doc. 92-1 at 2; Doc. 92-4 at 13).

unsure if the suspect was struck by the probes.[12] The suspect was unable to gain access to the wood line due to running into a fence and fell back towards Armenta. At that time[,] Armenta tackled the suspect[] and held him on the ground.[13]

While on the ground[,] I observed the suspect was actively resisting our commands to put his hands behind his back. I observed the subject reach his arm over Armenta's and he began clawing at the top of his head with his nails. At that time, I struck the subject in the right portion of his face, causing him to stop. The subject then swung his arm towards my face, jamming a finger into my eye, and knocking off my sunglasses from my face. The subject continued to claw for my right eye, so I struck him once more in the right portion of his face.[14] The suspect refused to remove his left arm from under his body after being ordered to multiple times. Armenta[15] then drive stunned the subject and continued giving the suspect verbal commands to comply. The suspect then complied, and he was placed in cuffs. The suspect was then assisted into the rear of Montgomery's cruiser.

---

[12] Plaintiff avers he became immobilized from the taser. (Doc. 92-1 at 2).

[13] Armenta "immediately gained a mount position on the suspect[,] [in response] to which he began to roll his body to the left." (Doc. 84-2 at 11, 26; Doc. 84-3 at 4; Doc. 84-4; Doc. 92-4 at 13; Doc. 94-1 at 42–43; *see also* Doc. 28 at 14). Plaintiff admits that when Armenta got on top of him, he was laying on his left side with his right side up and his right arm behind his back. (Doc. 92-1 at 2; *see also* Doc. 28 at 14–15). Plaintiff "began flailing his arms and kicking his legs, battering the deputies who were trying to handcuff him." (Doc. 84-2 at 5–6, 11–12, 14, 16; Doc. 92-4 at 13–14). Higgins was trying to control Plaintiff's hands, while Montgomery was trying to hold his legs. (Doc. 84-2 at 16; Doc. 92-4 at 13, 15; *see also* Doc. 28 at 15–16). Due to Plaintiff's active resistance, Armenta used his "right leg to lock-in Plaintiff's legs and placed his right hand on Plaintiff's face to prevent him from turning." (Doc. 84-2 at 11; Doc. 84-3 at 4). Plaintiff asserts it was unnecessary for Armenta to touch his face because he was not resisting. (Doc. 92-1 at 2; *see also* Doc. 28 at 14–15). Plaintiff adds he was not resisting when the deputies rolled him on his stomach. (Doc. 84-4; *see also* Doc. 92-1 at 2; Doc. 92-4 at 14). Plaintiff admits that before he was handcuffed, he moved his left hand under his chest but claims it was because he had difficulty breathing while Higgins had his knee on Plaintiff's back. (Doc. 28 at 15–16; Doc. 84-2 at 11–12, 14, 26; Doc. 84-3 at 4; Doc. 84-4 at 05:53-05:58; Doc. 92-1 at 3; Doc. 94-1 at 18–19, 44, 50–51; *see also* Doc. 84-4).

[14] While all of this was happening, at 4:07 p.m., Plaintiff was yelling: "My eye! My eye! . . . My face!" (Doc. 84-4; Doc. 94-1 at 20–21, 51). Plaintiff asserts that McGuire's strikes were without provocation or resistance. (Doc. 92-1 at 2; *see also* Doc. 28 at 14–15).

[15] While Plaintiff was on the ground, Armenta deployed his taser a second time, but the probes did not strike Plaintiff. (Doc. 84-2 at 11).

(Doc. 84-2 at 23–26 (names abbreviated)).

After Plaintiff was secured at 4:08 p.m., Bickhart arrived on the scene and escorted McGuire to Memorial Hospital for evaluation of his injuries. (Doc. 84-2 at 22; Doc. 84-4; Doc. 92-4 at 16). Armenta's head injury was evaluated on the scene by St. Johns Fire and Rescue. (*Id.* at 27–28). Plaintiff was also evaluated by St. Johns Fire and Rescue and was transported to Flagler Hospital for medical clearance. (Doc. 28 at 16–17; Doc. 84-2 at 6, 16; Doc. 92-2 at 13, 28–29; Doc. 92-4 at 17; Doc. 94-1 at 21, 45). The same day, he was transferred to Shands for elevated care. (Doc. 92-2 at 6, 8, 17–18, 36, 43, 99; Doc. 94-1 at 21). Plaintiff presented with significant swelling and abrasions on the face; blurry vision in both eyes; ecchymosis, swelling, and tenderness around the right eye; headaches; difficulty breathing; nausea; and pain in the back, neck, chest wall, abdomen, and pelvis. (Doc. 92-2 at 18–20, 22–23, 31, 33–34, 41, 45, 69). His chest X-rays were unremarkable. (*Id.* at 62–63, 113, 118). His diagnoses included a right-sided orbital floor closed fracture, a nasal bone closed fracture, visual disturbance, contusion of the right eyelid and periocular area, and subdural hematoma. (Doc. 92-2 at 6, 8, 17–18, 24, 40, 100). Plaintiff was discharged in stable condition the next day, and was referred for a non-emergency surgery of the right-sided orbital floor fracture. (Doc. 92-2 at 6, 8, 17–18, 36, 39, 43, 99; Doc. 94-1 at 21). The surgery took place on April 20, 2023, and was tolerated well.[16] (Doc. 28 at 18; Doc. 92-2 at 127, 129, 137, 140, 142–43, 145,

[16] Plaintiff asserts "the police stopped" his surgery, which he believed would occur on March 26, 2023. (Doc. 28 at 17; Doc. 92-1 at 3; Doc. 94-1 at 23). The medical records reflect, however, that the surgery would be an outpatient, non-emergency procedure. (Doc. 92-2 at 39).

147, 149, 203; Doc. 94-1 at 22). Plaintiff avers he continues to have blurred vision and pain in the right eye, for which he uses a daily eye solution. (Doc. 92-1 at 3).

## IV. DISCUSSION

Invoking qualified immunity, Defendants argue they are entitled to summary judgment on the excessive-force claims because the force used during Plaintiff's arrest was necessary and reasonable under the circumstances. (*See* Doc. 85). For the same reason, Defendants argue they are entitled to summary judgment on the failure-to-intervene claims. (*See* Doc. Nos. 85, 95). In addition, Defendants argue Plaintiff cannot succeed on his failure-to-intervene claims because they did not have an opportunity to intervene, and in any event, Plaintiff has abandoned his claims as to Armenta, Higgins, and Bickhart by failing to address them in his Response to Defendants' Motion.[17] (*See id.*).

### A. Standard

"Qualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Nolin v. Isbell*, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). As a result, this defense protects from suit "all but the plainly incompetent or those who knowingly violate the law."[18] *Mullenix v. Luna*, 577 U.S. 7, 12

[17] Defendants also argue that Plaintiff has abandoned his failure-to-intervene claim against McGuire, but it does not appear that Plaintiff has raised such a claim. To the extent he has, Plaintiff has not alleged sufficient facts to support it. (*See* Doc. 28).

[18] In determining whether a defendant is entitled to qualified immunity, courts view the facts and all reasonable inferences in the light most favorable to the plaintiff to the extent supported by the record, and then consider "the legal issue of whether the plaintiff's

(2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *Carr v. Tatangelo*, 338 F.3d 1259, 1266 (11th Cir. 2003). Indeed, as "'[g]overnment officials are not required to err on the side of caution,' qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful[.]" *Lee v. Ferraro*, 284 F.3d 1188, 1200 (11th Cir. 2002) (quoting *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1031 n.8 (11th Cir. 2001)).

To be entitled to qualified immunity, a defendant bears the initial burden of showing that his conduct was within the scope of his discretionary authority. *See Webster v. Beary*, 228 F. App'x 844, 848 (11th Cir. 2007); *Lee*, 284 F.3d at 1194. Here, at all times material to this case, Defendants were acting within the scope of their discretionary authority.[19] Accordingly, the burden shifts to Plaintiff to demonstrate that qualified immunity is not appropriate using the test established by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

In accordance with *Saucier*, the Court must ask whether the facts viewed in the light most favorable to Plaintiff "show [Defendants'] conduct violated a constitutional right[.]" *Id.*; *see also Hope v. Pelzer*, 536 U.S. 730, 736 (2002); *Beshers v. Harrison*, 495

---

'facts,' if proven, show that the defendant violated clearly established law." *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000); *Scott*, 550 U.S. at 381 n.8.

[19] "A government official acts within [his] discretionary authority if the actions were (1) undertaken pursuant to the performance of [his] duties and (2) within the scope of [his] authority." *Jones v. City of Atlanta*, 192 F. App'x 894, 897 (11th Cir. 2006) (quoting *Lenz v. Winburn*, 51 F.3d 1540, 1545 (11th Cir. 1995)). Making an arrest is thus a discretionary function for a police officer. *See Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004); *see also Lee*, 284 F.3d at 1194 (finding that "there can be no doubt that [the officer] was acting in his discretionary capacity when he arrested [the plaintiff]," even though the plaintiff asserted that the officer used excessive force in the manner in which he was arrested). Plaintiff's argument that Defendants "acted well outside of the scope of their discretionary authority," (Doc. 91 at 14), is both unsupported and meritless.

F.3d 1260, 1265 (11th Cir. 2007) (quoting *Scott*, 550 U.S. at 377). The Court must also ask whether the right allegedly violated was clearly established at the time of the violation. *Hope*, 536 U.S. at 739; *Saucier*, 533 U.S. at 201; *Scott*, 550 U.S. at 377; *Underwood v. City of Bessemer*, 11 F.4th 1317, 1328 (11th Cir. 2021). The Court may consider these questions in whichever order it chooses, and qualified immunity will protect the defendant if the answer to either question is "no." *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009); *Underwood*, 11 F.4th at 1328.

The Fourth Amendment's guarantee against unreasonable searches and seizures includes the right to be free from the excessive use of force in the course of an arrest. *See Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009). "In excessive force cases, whether a plaintiff's constitutional rights were violated is governed by the Fourth Amendment's objective reasonableness standard." *Johnson v. City of Miami Beach*, 18 F.4th 1267, 1272 (11th Cir. 2021) (citing *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008)). Under that standard, courts examine an officer's use of force "on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Johnson*, 18 F.4th at 1272 (quoting *Brown v. City of Huntsville*, 608 F.3d 724, 738 (11th Cir. 2010)).

"Determining whether an officer's use of force is unconstitutionally excessive involves two steps." *Charles*, 18 F.4th at 699. "First, we ask whether the specific kind of force is categorically unconstitutional." *Id.* "Second, if the kind of force is not categorically unconstitutional, we then ask, weighing the *Graham*[20] factors, whether the amount of force was excessive." *Id.* These factors include "the severity of the crime at issue,

---

[20] *Graham v. Connor*, 490 U.S. 386 (1989).

whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Baker v. City of Madison*, 67 F.4th 1268, 1279 (11th Cir. 2023) (quoting *Graham*, 490 U.S. at 396). "Other considerations are the need for the application of force, the relationship between the need and the amount of force used, [and] the extent of the injury inflicted . . . ."[21] *Id.* (citing *Hadley*, 526 F.3d at 1329). "[T]his multifactor analysis entails an assessment of the totality of the circumstances." *Acosta v. Miami-Dade Cnty.*, 97 F.4th 1233, 1239 (11th Cir. 2024) (internal citations omitted). Ultimately, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. Thus, courts "are loath to second-guess the decisions made by police officers in the field." *Vaughan v. Cox*, 343 F.3d 1323, 1331 (11th Cir. 2003). Further, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.*

The Eleventh Circuit has instructed that:

> [A] police officer violates the Fourth Amendment if he uses gratuitous force against a suspect who is secure, not resisting, and not a safety threat to the officer or other officers. *See, e.g.*, *Hadley*, 526 F.3d at 1330 (holding officer used excessive force when, in a single blow, he punched suspect who was handcuffed and was not struggling or resisting); *Lee*, 284 F.3d at 1199

[21] "We do not consider whether an officer acted in good faith or sadistically and maliciously" under the objective reasonableness standard of the Fourth Amendment when evaluating excessive force claims. *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347 (11th Cir. 2015).

> (holding that an officer's use of force after the plaintiff was "arrested, handcuffed, and completely secure, and after any danger to the arresting officer as well as any risk of flight had passed" was excessive). Conversely, we have held that it may be reasonable for an officer to use force against a suspect who is resisting and not subdued. *See, e.g.*, *Mobley*, 783 F.3d at 1351, 1355 (concluding officers' use of force in striking, kicking, and tasing suspect was not excessive where the suspect, though pinned on the ground, was "refusing to surrender his hands to be cuffed"); *Crosby*, 394 F.3d at 1334–35 (concluding officer's use of force was not excessive where suspect, though lying face down on the ground, "was able to wrestle his hand loose and push [the officer's] foot away").

*Johnson*, 18 F.4th at 1272–73 (internal citations modified).

"An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable for his nonfeasance." *Williams v. Radford*, 64 F.4th 1185, 1199 (11th Cir. 2023) (quoting *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007)). "To be held liable, the officer must both be 'in a position to intervene' and 'fail to do so.'" *Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019) (citation omitted). But "an officer cannot be held liable for failing to . . . intervene when there was no constitutional violation being committed." *Id.*

### B. Analysis

Plaintiff alleges Defendants used excessive force against him when: (1) McGuire conducted the PIT maneuver,[22] and then struck Plaintiff's face and right eye twice; (2) Armenta tasered and tackled Plaintiff; and (3) Higgins placed his knee on Plaintiff's

[22] Plaintiff's allegation that both McGuire and Armenta performed the PIT maneuver is flatly contradicted by the record, which Plaintiff seems to concede in his affidavit. (Doc. 28 at 13–14, 23; Doc. 84-2 at 25; Doc. 84-4; Doc. 92-1 at 2 (stating that although both McGuire and Armenta attempted to perform the PIT maneuver, Armenta failed, leaving McGuire to perform it)).

back.[23] (Doc. 28 at 13–16, 20). Additionally, Plaintiff alleges that Armenta, Higgins, Montgomery, and Bickhart failed to intervene when McGuire struck Plaintiff, and Bickhart failed to intervene in the PIT maneuver. (*Id.* at 15–16, 23).

***1. McGuire***

McGuire did not violate Plaintiff's Fourth Amendment rights by conducting the PIT maneuver. First, conducting a PIT maneuver is not categorically unconstitutional. *See, e.g.*, *Scott*, 550 U.S. at 386 ("A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death."). Further, under the totality of the circumstances, McGuire did not violate clearly established law by conducting the PIT maneuver. At the time McGuire implemented the PIT maneuver, he knew that: (1) Plaintiff was among the suspects in a credit card fraud case happening in real time; (2) Plaintiff nearly struck McGuire and other pedestrians in the mall parking lot[24]; (3) Plaintiff was actively fleeing the deputies at speeds exceeding

[23] To the extent Plaintiff alleges in passing that Montgomery used excessive force by holding Plaintiff's feet to the ground, Plaintiff has not addressed this allegation in response to Defendant's Motion and, as such, has not even attempted to show that Montgomery used objectively unreasonable force during his arrest. (*See* Doc. 85 at 6 n.7). Therefore, Montgomery is entitled to summary judgment on any such claim.

[24] While Plaintiff's allegations and averments are somewhat unclear as to what happened at the mall, in his criminal trial testimony, he admits that McGuire was walking near his van, which indicates he was aware of the deputy's presence. (Doc. 94-1 at 4 ("Now, when he got out[,] I can't say, but it was not in front of me. It wasn't by my window.")). And while Plaintiff denies driving at a high speed and being chased at the mall (Doc. 92-1 at 2; Doc. 94-1 at 4–5), his self-serving assertions are contradicted by the deputies' reports and deposition testimony (Doc. 92-4 at 9; *see also* Doc. 84-2 at 5, 12–15, 20–21, 24; Doc. 84-3 at 3), and are insufficient to defeat summary judgment. *See Bryant v. Rich*, 530 F.3d 1368, 1382 (11th Cir. 2008) (Wilson, J., concurring in part, dissenting in part) ("A prisoner cannot defeat summary judgment by relying on sham affidavits, bare and self-serving allegations, or other evidence that is incredible as a matter of law."); *see also Scott*, 550 U.S. at 380 ("Where the record taken as a whole

100 miles per hour; (4) Plaintiff had traveled into oncoming traffic on the interstate; (5) Plaintiff had attempted to run Armenta's vehicle off the interstate twice; and (6) Plaintiff continued to pose an immediate and substantial threat to the deputies and the public by failing to pull over or show any sign of slowing down.

Under these circumstances, it was reasonable for McGuire to implement the PIT maneuver in an attempt to immobilize Plaintiff's vehicle and avert "an actual and imminent threat to the public." *Sharp v. Fisher*, 532 F.3d 1180, 1183–84 (11th Cir. 2008) (affirming summary judgment on qualified immunity grounds in favor of an officer who conducted a PIT maneuver during a high-speed chase involving numerous officials from multiple jurisdictions where there were several civilian vehicles on the interstate during the pursuit and the suspect was driving erratically, failed to respond to blue lights and sirens, and gave no indication of slowing down or stopping the pursuit); *Clement v. McCarley*, 708 F. App'x 585, 590 (11th Cir. 2017) (affirming summary judgment on qualified immunity grounds in favor of an officer who pursued and hit plaintiff's car with his patrol vehicle because plaintiff was driving erratically and at a high rate of speed, was suspected of criminal activity, posed a threat to the public, struck the officer's vehicle with his car, and continued to flee).

---

could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" (citations omitted)). But even assuming Plaintiff did not realize he was being chased until he got on the interstate, (Doc. 92-1 at 2), Plaintiff admits he then made the conscious decision to flee from the deputies, who had engaged their lights and sirens and were driving at speeds exceeding 100 miles per hour so they could keep up with him, and he also made the decision to continue fleeing on foot after the vehicle pursuit had ended. (*See* Doc. 84-4; Doc. 94-1 at 11–13, 31–34, 36, 49; *see also* Doc. 94-1 at 41 (admitting he would have continued running on foot if there had been no fence on the side of the road to stop him)).

Viewing the facts and all *reasonable* inferences in the light most favorable to Plaintiff *to the extent supported by the record*, *see Scott*, 550 U.S. at 381 n.8; *Priester*, 208 F.3d at 925 n.3, the Court finds that all *Graham* factors weigh in Defendant's favor. Specifically, Plaintiff posed an immediate threat to the safety of the deputies and the public; his crimes (aggravated assault on a deputy, reckless driving, and fraud[25]) were sufficiently severe; Plaintiff was actively attempting to evade arrest by flight; the PIT maneuver was needed to stop the high-speed chase in order to avert danger to the public and the deputies; McGuire was justified in conducting the PIT maneuver after balancing "the risk of bodily harm to [Plaintiff] against the gravity of the threat [McGuire] sought to eliminate"; and there is no evidence that either Plaintiff or any of his passengers suffered bodily injury from the PIT maneuver. *Charles*, 18 F.4th at 699. Thus, under the totality of the circumstances, McGuire did not violate clearly established law by conducting the PIT maneuver.[26]

[25] After the chase, Plaintiff was convicted by a jury of two counts of aggravated assault on a law enforcement officer (for attempting to run over McGuire with his van at the mall and for attempting to run Armenta's vehicle off the road during the pursuit), two counts of battery on a law enforcement officer, one count of fleeing or attempting to elude law enforcement with high speed or reckless driving, one count of resisting an officer with violence, one count of resisting an officer without violence, and one count of reckless driving. (Doc. 84-6; *see also* Doc. 84-2 at 4–5). After a nolo contendere plea, Plaintiff was also adjudicated guilty of unlawful possession of stolen credit cards and theft. (Doc. 84-7).

[26] Even assuming that McGuire had violated internal policies by conducting the PIT maneuver as Plaintiff seems to suggest, the violation of a departmental policy would "not necessarily mean that the use of force was unconstitutional." *Roe v. Fryer*, No. 24-13588, 2025 WL 2327758, *5 (11th Cir. Aug. 13, 2025) (citing *Charles*, 18 F.4th at 701–02, which rejected the argument that a violation of a departmental policy should be considered as an additional factor in excessive-force analysis where other factors establish the officer did not engage in unconstitutionally excessive force).

In addition, McGuire did not violate Plaintiff's Fourth Amendment rights when he struck Plaintiff's face twice while the deputies were attempting to handcuff him. First, striking is not categorically unconstitutional. *See, e.g.*, *Mobley*, 783 F.3d at 1355–56 (stating that even when an officer uses severe force in striking or kicking a suspect, the force "is not necessarily excessive," and the reasonableness thereof is judged based on the totality of the circumstances). Further, McGuire's two strikes were not unreasonable under the circumstances. The video footage shows that Plaintiff was not secured and was still resisting when McGuire struck him. (Doc. 84-4). Although Plaintiff asserts that the two strikes were without provocation or resistance, the video evidence shows otherwise.[27] (Doc. 28 at 14–15; Doc. 84-4; Doc. 92-1 at 2). The record evidence shows that Plaintiff was resisting up until he was handcuffed. (*See, e.g.*, Doc. 84-4). Indeed, Plaintiff admits that he managed to roll his body to the left and move his left hand from his back towards his chest, while Montgomery and Armenta were both trying to control his legs, and Higgins was trying to control his hands. (Doc. 84-2 at 11, 16; Doc. 84-3 at 4; Doc. 92-1 at 3; Doc. 92-4 at 13, 15; Doc. 94-1 at 18–19, 44, 50–51). It was only after Armenta used his taser in a drive-stun mode that Plaintiff finally moved his left hand to his back and was handcuffed. (Doc. 84-2 at 11–12, 14, 16, 26; Doc. 84-3 at 4; Doc. 84-4). In addition, the strikes were not done without provocation. McGuire reports that he struck Plaintiff when he saw him clawing at the top of Armenta's head with his nails, causing blood to come out, and rather than stopping after McGuire's first strike, Plaintiff

[27] To the extent Plaintiff's averments are inconsistent with the video evidence, the Court accepts the video depictions over Plaintiff's version of the events. (*See* Doc. 84-4; Doc. 92-1 at 2).

proceeded to jam his finger into McGuire's eye, knocking off his sunglasses, which prompted the second strike.[28] (Doc. 84-2 at 26–28; Doc. 94-1 at 52).

Therefore, considering Plaintiff's resistance and attacks against the deputies, McGuire's two strikes were not unreasonable. *See Mobley*, 783 F.3d at 1355–56 (finding that "striking, kicking, and tasing the resisting and presumably dangerous suspect in order to arrest him were not unreasonable uses of force"); *see also Baker v. Clements*, 760 F. App'x 954, 957 (11th Cir. 2019) (affirming summary judgment in officers' favor on qualified immunity grounds where the officers used fist strikes to complete plaintiff's arrest while he was lying face-down on the ground, but had just attempted to evade arrest by flight and had refused multiple orders to get on the ground, to stop resisting, and to give his hands to the officers). Indeed, "five of the factors we consider from the perspective of a reasonable officer on the scene—severity of the crime, whether the suspect poses an immediate threat to safety, whether he is actively resisting or attempting to evade arrest, the need for the application of force, and the relationship between the need and amount of force used—weigh against [Plaintiff]." *Mobley*, 783 F.3d at 1355. The only factor that "weighs slightly" in Plaintiff's favor is the extent of his eye injury.[29] *Roe*, 2025 WL 2327758, at *5.

---

[28] Armenta was later evaluated by Fire and Rescue for the laceration on his head, and McGuire was escorted to Memorial Hospital for evaluation of his injuries. (Doc. 84-2 at 22, 27–28).

[29] It is not entirely clear whether Plaintiff's eye injury was caused by McGuire's strikes. It is undisputed that while Plaintiff was fleeing on foot, he hit the wood line fence frontally, and was then tackled to the ground, lying face down at times, amidst bushes and tree branches. (Doc. 84-4; Doc. 94-1 at 42, 47–48).

Plaintiff's injury was not insignificant considering it required surgery. (Doc. 28 at 16–18; Doc. 84-2 at 6, 16; Doc. 92-2 at 6, 8, 13, 17–20, 22–24, 28–29, 31, 33–34, 36, 39–41, 43, 45, 69, 99–100, 127, 129, 137, 140, 142–43, 145, 147, 149, 203; Doc. 92-4 at 17; Doc. 94-1 at 21–22, 45). Nevertheless, the injury "alone does not make the use of that amount of force unreasonable." *Mobley*, 783 F.3d at 1355; *see also Cockrell*, 510 F.3d at 1311 (finding that the injury factor was not dispositive even though "the extent of the injury was relatively extensive," where the defendant was justified in using force, he could not have foreseen that "a simple push would result in as much injury as [plaintiff] unfortunately suffered," and he "immediately summoned medical assistance" for plaintiff). Indeed, "the typical arrest involves some force and injury." *Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008); *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003) (stating that "some use of force by a police officer when making a custodial arrest is necessary and altogether lawful, regardless of the severity of the alleged offense" (citation omitted)). Moreover, Plaintiff's injury was "not disproportionate to the force that the officers reasonably could have believed was required to subdue him." *Mobley*, 783 F.3d at 1356. Thus, under the totality of the circumstances, McGuire's strikes were not unreasonable and did not violate Plaintiff's constitutional rights.

#### *2. Armenta*

Similarly, Armenta did not violate Plaintiff's Fourth Amendment rights when he tasered, tackled, tasered again, and drive-stunned Plaintiff in the course of his arrest. First, neither tasering nor tackling is a categorically unconstitutional kind of force. *See Charles*, 18 F.4th at 699, 701. Further, accepting the video depictions over Plaintiff's version of the facts, (Doc. 84-4; Doc. 92-1 at 2–3), the Court finds that Armenta's uses of

force were not unreasonable under the circumstances. Armenta deployed his taser, seemingly twice, when Plaintiff was running from the deputies in the direction of the wood line, and was not compliant with their orders to stop and show his hands. (Doc. 84-2 at 11, 14, 25; Doc. 84-3 at 4; Doc. 84-4; Doc. 92-1 at 2; Doc. 92-4 at 13). Regardless of whether the probes hit him, almost simultaneously Plaintiff hit the fence and was then tackled to the ground by Armenta.[30] (Doc. 84-2 at 11, 26; Doc. 84-3 at 4; Doc. 84-4; Doc. 92-4 at 13; Doc. 94-1 at 41–43).

Once Plaintiff was on the ground, the deputies tried to secure him by holding his body down and repeatedly telling him to put his hands behind his back. (Doc. 84-2 at 26; Doc. 84-4; Doc. 92-4 at 14). Armenta and Montgomery were trying to control Plaintiff's legs, while Higgins was trying to control his hands. (Doc. 84-2 at 11, 16; Doc. 84-3 at 4; Doc. 92-1 at 3; Doc. 92-4 at 13, 15; Doc. 94-1 at 18–19, 44, 50–51). Instead of complying, however, Plaintiff rolled his body to the left, swinging his arms and kicking his legs. (Doc. 84-2 at 5, 11–12, 14, 16; Doc. 92-4 at 13–14). At 4:07 p.m. (or 06:25 minutes into the video), the deputies managed to turn Plaintiff on his stomach, but they were still struggling to handcuff him because he had moved his left hand from his back towards his chest. (Doc. 84-2 at 11–12, 14, 26; Doc. 84-3 at 4; Doc. 84-4; Doc. 92-1 at 2; Doc. 92-4 at 14). At 4:08 p.m. (06:48 minutes into the video), Armenta tasered Plaintiff again, this time in a drive-stun mode. (Doc. 84-2 at 11–12, 14, 16, 26; Doc. 84-3 at 4; Doc. 84-4; Doc. 94-1

[30] Plaintiff provides inconsistent statements as to how he fell. In his affidavit, he avers the taser immobilized him. (Doc. 92-1 at 2). In his criminal trial, however, he testified that the deputies "got [him] down on the ground" after he hit the fence. (Doc. 94-1 at 17–18). With the benefit of the video evidence, it appears Plaintiff hit the fence almost simultaneously as he was tasered, and was then tackled by Armenta, all in a matter of seconds. (*See* Doc. 84-4). Irrespective of how he fell, Plaintiff continued resisting even while he was on the ground.

at 20; Doc. 92-4 at 14). Then, Plaintiff moved his hand and was finally handcuffed. (*Id.*). After Plaintiff was handcuffed, any force ceased. (Doc. 84-4; Doc. 92-4 at 16).

Viewing the facts and all reasonable inferences in the light most favorable to Plaintiff to the extent supported by the record, the Court finds that all *Graham* factors weigh in Defendant's favor. Plaintiff posed an immediate threat to the safety of the deputies and the public; his crimes were sufficiently severe; he was attempting to evade arrest by flight and physical resistance; the force used—tasering and tackling—was necessary to immobilize and subdue Plaintiff so he could be secured; the amount of force used was not disproportional to the need for force considering Plaintiff's flight and resistance; and there is no evidence that Plaintiff suffered significant bodily injury from being tasered and tackled. Thus, under the totality of the circumstances, Armenta did not violate clearly established law. *See Charles*, 18 F.4th at 700–01 (finding that "a tackle was among the least forceful ways to advance the arrest and gain control of the situation" and was, therefore, reasonable, where the suspect's "pre-tackle behavior constituted active resistance"; and finding that the use of a taser was also reasonable where the suspect was actively obstructing his arrest); *Mobley*, 783 F.3d at 1355–56 (finding that "striking, kicking, and tasing the resisting and presumably dangerous suspect in order to arrest him were not unreasonable uses of force"); *Hoyt v. Cooks*, 672 F.3d 972, 979–80 (11th Cir. 2012) (finding the officers were entitled to qualified immunity where the suspect continued resisting their repeated attempts to handcuff him between tasing attempts by spreading his arms apart and rolling around); *Roe*, 2025 WL 2327758, at *6 (concluding the arresting officer did not violate the Fourth Amendment by tackling plaintiff, who was not completely subdued at the time).

### *3. Higgins*

Higgins did not violate Plaintiff's Fourth Amendment rights when he placed his knee on Plaintiff's back while Plaintiff was still unsecured and resisting arrest. First, pressing a knee to a suspect's back is not categorically unconstitutional. *See, e.g.*, *Croom v. Balkwill*, 645 F.3d 1240, 1252–53 (11th Cir. 2011). Further, Higgins's use of force was not unreasonable under the circumstances. As stated previously, the deputies were trying to secure Plaintiff who was actively resisting up to the moment he was handcuffed. The deputies were trying to subdue Plaintiff by, inter alia, giving him verbal commands, tasering and tackling him, holding his body down, and rolling him on his stomach. (*See, e.g.*, Doc. 84-4). In such a tense, uncertain, and rapidly evolving situation, it was not unreasonable for Higgins to place his knee on Plaintiff's back, while he was also trying to maintain control of his hands. (*See id.*). At that time, Plaintiff still posed an immediate threat to the safety of the deputies and the public; his crimes were sufficiently severe; he was still attempting to evade arrest by actively resisting; the force was necessary to prevent Plaintiff from fleeing and to subdue him; the amount of force used was not disproportional to the need for force considering Plaintiff's resistance; and Plaintiff did not seem to suffer any significant injury from Higgins's use of force. (*See id.*). While Plaintiff asserts it was hard for him to breathe with a knee on his back, (Doc. 28 at 15–16; Doc. 92-1 at 3; Doc. 94-1 at 19; *see also* Doc. 84-4), Plaintiff's chest X-rays were unremarkable, and he did not complain of any breathing issues going forward. (*See* Doc. 92-2 at 62–63, 113, 118). Thus, under the totality of the circumstances, the force used by Higgins was reasonable from the perspective of a reasonable officer on the scene.

Moreover, even if the force used by Higgins was unnecessary, it was not unlawful because it was de minimis. *See Croom*, 645 F.3d at 1252–53 (affirming summary judgment in favor of an officer who held plaintiff on the ground by pressing a foot or a knee in plaintiff's back for up to ten minutes because the force, even if unnecessary, was de minimis and not a violation of the Fourth Amendment, even though plaintiff was compliant and did not pose a threat to officer safety); *Durruthy*, 351 F.3d at 1094 (finding that an officer used de minimis force when she forced the suspect down to the ground and placed him in handcuffs); *Nolin*, 207 F.3d at 1255 (finding force to be de minimis where an officer grabbed plaintiff "from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and handcuffed him"); *Roe*, 2025 WL 2327758, at *10 (finding it was reasonable for an officer "to place his knees on [plaintiff's back and neck for approximately one minute] as part of the force ordinarily used to safely effect an arrest" even after plaintiff was handcuffed). Therefore, Higgins did not violate Plaintiff's Fourth Amendment rights when he placed his knee on Plaintiff's back.

Having found that Defendants did not violate any constitutional right, the Court need not determine whether such right was clearly established. *See Durruthy*, 351 F.3d at 1094–95 ("Because we find no constitutional violation, we need not address whether the constitutional right at issue was clearly established."). Therefore, since Defendants are entitled to qualified immunity on the excessive-force claims, their Motion will be granted as to those claims.

In addition, having found that Defendants' use of force was reasonable, Plaintiff's failure-to-intervene claims against Montgomery, Higgins, Armenta, and Bickhart necessarily fail. *See, e.g.*, *Mobley*, 783 F.3d at 1357 (granting summary judgment on a failure-to-intervene claim when no excessive force was used, because "a police officer has no duty to intervene in another officer's use of force when that use of force is not excessive"); *Crenshaw v. Lister*, 556 F.3d 1283, 1293–94 (11th Cir. 2009) (finding that a failure-to-intervene claim cannot stand if no excessive force was used). Therefore, the Court will also grant Defendants' Motion with respect to Plaintiff's failure-to-intervene claims.

## V. CONCLUSION

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendants' Motion for Summary Judgment (Doc. 85) is **GRANTED**.
2. The Clerk shall enter judgment in favor of Defendants McGuire, Armenta, Higgins, Bickhart, and Montgomery, and against Plaintiff, terminate any pending motions, and close the file.

**DONE AND ORDERED** in Jacksonville, Florida on August 7, 2026.

WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Jax-11

c: Robert Mustafa La'Hori, #W62262
Counsel of Record